# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| EXCELLENT INVENTIONS LLC, | § | |
| a limited liability corporation, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-04-4543 |
| | § | |
| FKA DISTRIBUTING CO. | § | |
| operating under the assumed name | § | |
| HOMEDICS, INC, a corporation, and | § | |
| HOMEDICS-USA, INC., a corporation | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

The world is apparently not noisy enough.  The holder of two patents claiming wind chimes that produce noise without the necessity of wind sues the seller of devices that allegedly infringe this design. Plaintiff, Excellent Inventions, LLC, seeks a preliminary injunction prohibiting defendants, FKA Distributing and Homedics-USA ("Homedics"), from offering for sale or selling wind chimes that allegedly infringe U.S. Patent No. 6,417,763 (the '763 Patent) and U.S. Patent No. 6,768,416 (the '416 Patent)  (Docket Entry No. 15).  Homedics asserts that Excellent Inventions has not shown a likelihood of prevailing on the merits or that it will suffer irreparable harm if the injunction is denied.  (Docket Entry No. 26).

On May 17, 2005, this court held a hearing on the application for preliminary injunction and on the construction of the patent claims under *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370 (1996). (Docket Entry No. 31).   Based on the pleadings, motions and responses, the parties' submissions, the evidence and arguments of counsel, and the applicable law, this court enters findings of fact and conclusions of law and, based on those findings and conclusions, denies Excellent Invention's application for a preliminary injunction.

## I.      Background

The two patents at issue are the '763 Patent and the '416 Patent.  The inventor listed on both patents is James Petruzzi, who assigned his interest to Excellent Inventions in November 2004.  (Docket Entry No. 24, Ex. J).   The '763 Patent was filed on March 17, 2000 and issued on July 9, 2002.  The '416 Patent was filed as a continuation of the '763 Patent on May 31, 2002 and issued on July 27, 2004.

The abstract of the '763 Patent describes the invention as follows:

> A machine for automated generation of movement of chimes with a base, a power source in the base electromagnetically connected to a post, chimes disposed about the post for receiving electromagnetic energy, a control circuit for generating intermittent electric power to said source for creating magnetic forces on said chimes.  The chimes may also be moved by electric power, water movement, wind generated by the power source or ionic wind movement.

(Docket Entry No. 24, Ex. A).  The Summary of the Invention section in the '763 Patent states in part as follows:

> A primary advantage of the invention is to provide a wind chime emulator for indoor use.
>
> Another advantage of the invention is to provide a wind chime that operates by generated wind.

. . .

In accordance with a preferred embodiment of the invention a machine for automated generation of movement of chimes comprises a base, a power source in said base electro-magnetically connected to a post, chimes disposed about the post for receiving electromagnetic energy and a control circuit for generating intermittent electric power to said source for creating magnetic forces on said chimes to create movement of the chimes.

In accordance with another preferred embodiment of the invention a machine for automated generation of movement of chimes comprises a base having a motor for generating intermittent power, a wind generator powered by the motor, chimes disposed in proximity to the wind generator that move in response to the wind.

(Docket Entry No. 24, Ex. B, col. 1, ll. 28-54).

Excellent Inventions claims infringement of claim two of the '763 Patent, which reads:

A machine for automated generation of movement of chimes comprising:

a base having a motor for generating intermittent power;

a wind generator powered by said motor;

chimes disposed in proximity to said wind generator that move in response to the wind thereby creating a sound.

(Docket Entry No. 24, Ex. A).

Excellent Inventions also claims infringement of claim one and claim two of the '416 Patent. Claim one reads:

A machine for automated generation of movement of chimes comprising:

> a base; a power source in said base for generation of wind;
>
> chimes disposed in proximity to said wind;
>
> a control circuit for controlling said power source to generate intermittent wind thereby causing said chimes to emit sound.

Claim two of the '416 Patent reads:

> A machine for automated generation of wind movement comprising:
>
> a base;
>
> a power source in said base;
>
> chimes that move in response to wind from programmed power generated by said power source to simulate random wind.

(Docket Entry No. 24, Ex. B).

The accused products are three different models of indoor wind chimes:  the Envirascape Soothing Chimes ("WC-100"); the Envirascape Peaceful Chimes ("WC-150"); and the Envirascape Tranquil Chimes with Alarm Clock ("WC-200").  (Docket Entry No. 29, Ex. P).[1]  The products have the three basic components:  a base, chimes, and an adaptor. The base contains a motor that can be powered by battery or, through use of the adaptor, an electrical outlet.  (Docket Entry No. 24, Ex. M).  The motor powers a fan that in turn causes the chimes to move, producing sound.  (Docket Entry No. 24, Ex. M).  The fans operate at three frequency settings.  (Docket Entry No. 24, Ex. M).  Each of the three frequencies produces chiming noises in a different  pattern.  For example, the fan could be on for 3

---

[1]  WC-100 and WC-150 appear to be very similar, except that WC-100 has a lantern shape and WC-150 is rectangular.

seconds, off for 15 seconds, on for 5 seconds, off for 35 seconds, on for 4 seconds, and then off for 18 seconds before repeating the sequence. (Docket Entry No. 24, Ex. M). The WC-200 differs in that it contains a clock and may be set so that the chimes operate as an alarm clock. If the user turns off the alarm clock mode, the WC-200 functions the same way as the WC-100 and WC-150. (Docket Entry No. 29, Ex. P).

Sometime during July 2002, Homedics began selling the WC-100, WC-150 and WC-200 products. (Docket Entry No. 26, Ex. 13). The product line has not performed well. Homedics no longer sells the products to retail distributors. The products are available only if the retail stores that purchased them from Homedics have unsold inventory. (Docket Entry No. 31).

In August 2002, Petruzzi sent Homedics a letter offering a license to sell the WC-100, WC-150, and WC-200 products. (Docket Entry No. 26, Ex. 3). Mark Cantor, an attorney for Homedics, and Petruzzi corresponded through a series of e-mails. In November 2002, Cantor sent Petruzzi an e-mail stating that Homedics had discovered invalidating prior art, Japanese Patent No. 11084037, OURA KOJI ("the Japanese Patent"). (Docket Entry No. 26, Ex. 5). Homedics obtained an English translation of the Japanese Patent, published on March 26, 1999, and forwarded the translation to Petruzzi. Cantor told Petruzzi that Homedics considered claim two of the '763 Patent to be anticipated. (Docket Entry No. 26, Ex. 7). Petruzzi responded that he did not believe the Japanese Patent would invalidate the '763 Patent because the device claimed in the Japanese Patent is "an alarm clock using a fan to

activate bells. . . ," while the '763 Patent did not claim an alarm clock function.  (Docket Entry No. 26, Ex. 5).

Homedics declined a license on the basis that the '763 Patent was invalid.  (Docket Entry No. 29, Ex. O, p. 1).  Cantor stated that Homedics was aware of the continuation application Petruzzi had filed in May 2002; that it would review the claims when the patent issued and consider a license agreement based on those claims; and would consider a design modification or a lump sum payment to avoid conflicts in the future.  (Docket Entry No. 29, Ex. O, pp. 1-2).  On January 21, 2003, Petruzzi filed a lawsuit in the federal district court in the Southern District of Texas, asserting infringement of the '763 Patent.  On February 10, 2003, Cantor sent a letter to Petruzzi, stating Homedic's position that the '763 Patent was invalid in light of the Japanese Patent, but offering a $25,000 payment end any dispute. (Docket Entry No. 26, Ex. 10).  Cantor also stated that Homedics planned to defend the suit on invalidity grounds and that "the clear invalidity" of the '763 Patent might be a ground for sanctions under Rule 11 of the Federal Rules of Civil Procedure.  (Docket Entry No. 26, Ex. 10).  In May 2003, Petruzzi voluntarily dismissed the suit, without explanation or prejudice. (Docket Entry No. 26, Ex. 12).

During the prosecution of the '416 Patent, Petruzzi disclosed the Japanese Patent to the Patent Office.  (Docket Entry No. 24, Ex. E).  The PTO initially rejected claim one of the '416 Patent as unpatentable "over Christensen (US Pat. 5,072,208) in view of Tury et al." and rejected claim two as unpatentable over the Japanese Patent, in view of Tury.  (Docket

Entry No. 24, Ex. F).[2]  The Japanese Patent disclosed a "wind chime clock" with an alarm

function, using wind chimes to mark the time.  The device is described as follows:

> An alarm clock main body 1 is provided with a motor 2; a fan 3;
> an alarm device 4; a control circuit 5; and a single or plurality of
> wind chimes 6 disposed in front of the fan 3.  The motor 2 is
> controlled by the control circuit 5 in response to an alarm signal
> from the alarm device 4, to blow air towards the wind chimes 6
> via the fan 3 at an intensity and in a direction that causes the
> wind chimes to ring.

(Docket Entry No. 29, Ex. 8, p. 0000434).  The wind chime clock can be programmed to

chime "every hour or every thirty minutes, according to demand.  In addition, the wind

chimes can be prevented from ringing late at night."  (*Id.,* p. 0000437).

Petruzzi filed a request for continued examination.  (Docket Entry No. 24, Ex. G, pp.

1-7).  Petruzzi described claim one of the '416 Patent as "claim[ing] a control circuit for

controlling the operation of the power to create random wind function."  (Docket Entry No.

24, Ex. G, p. 5).  To distinguish claim two of the '416 Patent from the Japanese Patent,

Petruzzi stated that the Japanese Patent "teaches away from an intermittent generating wind

device in its use as an alarm clock" because it "uses a program to create a regular alarm

function, the antithesis of the claimed 'random wind.'"  (Docket Entry No. 24, Ex. G, p. 6).

In contrast, Petruzzi asserted that claim two of the '416 Patent "disclose[s] the generation of

---

[2]  According to the PTO, Christensen discloses almost every element of Petruzzi's invention except "the claimed control circuit controlling the power to generate 'intermittent' wind."  The PTO thought that Tury, which disclosed "light powered chime using solar energy to produce an intermittent rotation of motor shaft 4 used in providing energy to striker 7 to hit one or more of the chimes 8," made obvious to one of ordinary skill in the art the incorporation of a motor such as the one disclosed by Tury, within the framework of Christensen, which the PTO believed would provide the intermittent wind lacking in Christensen.  (Docket Entry No. 24, Ex. F, p. 5).

random wind" and "requires programmed generation . . . to simulate random wind and motivate the chimes . . . ." (Docket Entry No. 24, Ex. G, p. 13).  The PTO allowed the claims on October 15, 2003. (Docket Entry No. 24, Ex. H).  The '416 Patent issued on July 27, 2004.

Excellent Inventions claims that the accused products literally infringe the asserted claims of the '763 Patent and the '416 Patent.  Homedics argues that the asserted claims of the two patents are invalid and not infringed by its products.  In connection with the '763 Patent, Homedics asserts equitable estoppel based on the dismissed lawsuit.  Homedics President Ron Ferber stated in a declaration that the dismissal led Homedics to believe that Petruzzi agreed that the patent was invalid; that he would not try to enforce the patent against the Homedics products; and that Homedics relied on this belief in continuing to sell the accused products without alteration.  (Docket Entry No. 26, Ex. 13, p. 2).  Homedics alleges inequitable conduct in connection with the prosecution of the '416 Patent Application. Homedics contends that Petruzzi, attempting to use the prosecution history of the '416 Patent Application to insulate the '763 Patent from an invalidity challenge based on the Japanese Patent, made false statements about the Japanese Patent to overcome the examiner's objections.  Homedics argues that the '763 Patent and the '416 Patent are anticipated or made obvious by the Japanese Patent.

Excellent Inventions argues that the term "intermittent" must be construed to have the same meaning in both the '763 and the '416 Patents and asserts that the proper construction is "irregular" starting and stopping.  According to Excellent Inventions, "a

motor for generating intermittent power" in claim two of the '763 Patent is properly construed to mean a motor for generating power that starts and stops at irregular intervals and "intermittent wind" in claim one of the '416 Patent is properly construed to mean wind that stops and starts at irregular intervals.  (Docket Entry No. 29).

Homedics argues that the later '416 Patent uses "intermittent" differently from its use in the '763 Patent.  Homedics asserts that Excellent Invention is improperly attempting to use the prosecution history of the '416 Patent to define "intermittent" in the earlier '763 Patent as limited to irregular intervals.  Homedics insists that the term "motor for generating intermittent power" in claim two of the '763 Patent is properly construed to mean a motor for generating power that starts and stops at intervals that can be either regular or irregularly spaced, not only  irregular intervals.  Homedics claims that properly construed, claim two of the '763 Patent is invalid because it includes every limitation of the Japanese Patent, which discloses a device that operates at regular intervals.   Homedics argues that the term "intermittent wind" in claim one of the '416 Patent was limited by Petruzzi's prosecution history arguments to mean wind occurring at "random" intervals.  Homedics claims that the '416 Patent teaches a device that simulates the random nature of natural wind, and that, contrary to Petruzzi's representation to the Patent Office that the Japanese Patent only operated at regular intervals,  the Japanese Patent also "simulates natural wind," so that the Japanese patent invalidates the '416 Patent as well.

Homedics claims that its products do not infringe claim two of the '763 Patent or claim one of the '416 Patent, because the chimes do not move in response to the wind that

the device generates, but rather in response to a pendulum.  Homedics also claims that its products do not infringe the '416 Patent because they generate a wind that stops and starts at irregular but predetermined, not random, intervals.

Finally, Homedics argues that Excellent Inventions has not shown irreparable harm necessary to justify the issuance of a preliminary injunction.  Homedics emphasizes that the patents in issue are "paper patents," that they have never been reduced to practice.  Homedics argues that it no longer sells the products wholesale and any harm to Excellent Inventions from the few sales from remaining inventory can be adequately compensated with monetary damages.[3]  Excellent Inventions relies on the legally created presumption of irreparable harm arising from a showing of likelihood of success on the merits and asks this court to enter an injunction that would bind all of Homedics's retailer customers.  Homedics asks for a bond of $1,000,000 in the event this court grants the injunction because of the disruption of customer relations they fear would occur if Excellent Inventions sent the preliminary injunctions to all of Homedics's resellers.

## II.   Claim Construction

The first step is determining the meaning and scope of the patent claims.  *PC Connector Solutions LLC v. Smartdisk Corp. et al*, 406 F.3d 1359, 1362 (Fed. Cir. 2005); *Chimie PPG Industries Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *Markman v. Westview*

---

[3]  Excellent Inventions claims that as of May 11, 2005, the date they filed their reply to the Homedics response to the motion for preliminary injunction, the accused products could still be found for sale on the Homedics website.  (Docket Entry No. 29, p. 4).  Since that date, however, the accused products have been removed from the website.

*Instruments, Inc.*, 52 F.3d at 976.  Claim construction is a matter of law.  *Bai v. L&L Wings,*

*Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  A court initially relies on intrinsic evidence –

the claims, the written specification, and the prosecution history – to learn the meaning of

the terms.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

"The terms used in the claims bear a 'heavy presumption' that they . . . have the ordinary

meaning that would be attributed to those words by persons skilled in the relevant art."

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).[4]  "Claims

must be read in view of the specification, of which they are part."  *Markman*, 52 F.3d at 979.


The disputed terms from claim two of the '763 Patent and claim one of the '416 Patent

are emphasized in bold print below.  Claim two of the '763 Patent states:

> A machine for automated generation of movement of chimes comprising:
>
> a base having a **motor for generating intermittent power**;
>
> a wind generator powered by said motor;
>
> chimes disposed in proximity to said wind generator that move in response to the wind thereby creating a sound.

_____

[4]  A court may refer to general usage or technical dictionaries, because they can "help educate the court regarding the field of invention and can help the court determine what a person of ordinary skill in the art would understand the terms to mean. . . ."  *Phillips v. AWH Corp.*, 2005 WL 1620331 *11 (Fed. Cir. 2005) (en banc).  However, dictionaries are considered extrinsic evidence, which is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Phillips*, 2005 WL 1620331 *10 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).  "[T]he court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly."  *Id.* at *11.

(Docket Entry No. 24, Ex. A).

Claim one of the '416 Patent reads:

> A machine for automated generation of movement of chimes comprising:
>
> a base; a power source in said base for generation of wind;
>
> chimes disposed in proximity to said wind;
>
> **a control circuit for controlling said power source to generate intermittent wind** thereby causing said chimes to emit sound.

(Docket Entry No. 24, Ex. B).

### A.   The Meaning of "Intermittent Power" in the '763 Patent

Excellent Inventions has proposed a construction for "intermittent" in both patents as "stopping and starting at irregular intervals."   This proposed construction relies on the primary purpose of the invention – "to simulate, through a controlled device, natural wind which itself starts and stops at irregular intervals" – and the prosecution history of the later '416 Patent. (Docket Entry No. 23, p. 7).  Homedics contends that the '763 Patent does not support construing the claim term, "a motor for generating intermittent power," to mean only power generated at irregular intervals.  The Homedics proposed construction of "a motor for generating intermittent power" is a "a motor that operates at intervals – both regular and irregular."

This court finds that the term "intermittent power" in claim two of the '763 Patent means power generated at intervals, regular or irregular.  In so determining, the court looks to the intrinsic evidence of the patent, "the patent itself, its claims, written description, and,

if in evidence, the prosecution history." *Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973, 976-77 (Fed. Cir. 1999).   Excellent Inventions relies heavily on the prosecution history of the '416 Patent in the proposed claim construction of "intermittent" in the '763 Patent as well as the '416 Patent.   Excellent Inventions correctly argues that generally, a claim term must usually be given a consistent construction throughout a patent. *Georgia Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999) (unless a patent otherwise provides, a claim term cannot be given a different meaning in the various claims of the same patent); *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) (holding that claim term found in different claims must be interpreted consistently).   But Excellent Inventions's reliance on isolated statements from the prosecution history of the '416 Patent Application to construe a claim term from the '763 Patent is misplaced for several reasons.

First, the claims are different.  Claim one of the '416 Patent calls for "a control circuit for controlling said power source to generate *intermittent wind* thereby causing said chimes to emit sound"; claim two of the '763 Patent calls for a "motor for generating *intermittent power*."  "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

Second, the prosecution history of the '763 Patent is not before this court.  Any later action by a patentee cannot change the construction of a patent claim.  Instead, patent claims should be construed as if the case was brought the day after issuance. *See Vitrionics Corp.*

*v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that not even a patentee's later actions may change the proper construction of a patent, in order to permit public reliance on the record).  "Although prosecution history can and should be used to understand the language used in the claims, it . . . cannot 'enlarge, diminish, or vary' the limitations in the claims." *Markman,* 52 F.3d at 979 (quoting *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227, 26 L.Ed. 149 (1880)).  When the specification and the prosecution history conflict, any ambiguities must be resolved in favor of the specification and the claims.  *See Biogen, Inc. v. Berlex Labs., Inc*., 318 F.3d 1132, 1140 (Fed. Cir.2003).

Nothing in the claim itself limits the term "intermittent power" to "power that occurs or is generated at irregular intervals."  *See Liebel-Flarsheim Co.,* 358 F.3d at 904-05;  *In re Paulsen,* 30 F.3d 1475, 1480 (Fed. Cir. 1994) (improper for patentee to import "extraneous" limitation to avoid anticipation apart from any need to interpret particular words or phrases in the claim).  Excellent Inventions relies on the invention's purpose – to simulate the inherently irregular nature of natural wind – to support its construction that "intermittent" power means power that occurs at irregular intervals.  Excellent Inventions points out that the specification "describes how natural wind can be simulated through a program using 'predetermined frequency or timetable or any other programmed order.'" (Docket Entry No. 15, p. 7).  The portion of the specification cited describes the power source, as follows:

> The power source 12 is controlled by a control circuit 16 that induces electrical power to the post <u>at predetermined times or randomly</u> depending upon the desired sound.  A <u>random generator</u> 17 in circuit 16 is capable of causing the power source to operate at different times to create the kind of random sounds a wind chime might make in

> response to actual natural wind.  The control circuit 16 <u>may also</u> be programmed to create movement on the chimes on a <u>predetermined frequency or timetable or any other programmed order</u>.

(Docket Entry No. 24, Ex. A, col. 2, ll. 43-52)(emphasis added).  The words "may also," make clear that a "predetermined frequency" and "programmed order" are different from "random."  The specification makes it clear that the circuit that controls the motor can be set to predetermined intervals or "randomly."   Although the preferred embodiment uses a "random generator" "designed to achieve a realistic wind generation," (*Id.*, col. 3, ll. 9-11), the description concludes by stating that "it would be well known in the art to create a motor that activated the fan in a more recurrent fashion or continuously." (*Id.,* col. 3, ll. 9-21).

Because the intrinsic evidence resolves the meaning of the term in dispute, it is unnecessary to examine extrinsic evidence.  *See Vitrionics*, at 90 F.3d 1583.[5]  "Intermittent power" as used in the '763 Patent means "power generated at irregular or regular intervals."

### B.    The Meaning of "Intermittent Wind" in the '416 Patent

Homedics argues that the term "said power source to generate intermittent wind" in claim one of the '416 Patent" should be construed as "said power source to generate wind at *random* intervals."  Excellent Inventions contends that it is error to construe "intermittent" in the '416 Patent as limited to "random intervals" and argues that the proper definition of "intermittent wind" is "wind stopping and starting at irregular intervals."

---

[5]  Webster's Ninth New Collegiate Dictionary's definition of "intermittent" provides support for this court's construction: "coming and going at intervals: not continuous." Dictionary.com defines "intermittent" as "stopping and starting at intervals."  Considered in the context of the intrinsic evidence, the dictionary definition provides a reliable interpretation. *See Phillips*, 2005 WL 1620331 at *11.

The term "random" is not found within claim one, which refers to "a control circuit for controlling said power source to generate intermittent wind" that cause chimes to emit sound.  The term "random" is found within claim two, which refers to "chimes that move in response to wind from programmed power generated by said power source to simulate random wind."  The summary of the invention and the detailed description of the preferred embodiments use the word "intermittent" to describe power generated in some of the different embodiments and to describe wind; the word "random" is used to describe a type of generator and to describe the nature of actual wind.   The preferred embodiments include magnetically-powered wind chime that can operate "at predetermined times or randomly"; water-generated movement of the chimes that occurs when water "intermittently" passes the chimes; wind-generated movement of the chimes in which the wind is created by a "random generator" driving a motor that in turn drives a fan that causes the chimes to move, in a fashion that can be "more recurrent or continuously" or "at irregular intervals that may also rotate at different speeds or in different directions to create the effect of random wind moving the chimes."   A fourth preferred embodiment uses a wind generator powered by water moving across wheels at "intermittent times" to drive the fan "intermittently."   A fifth embodiment uses an ionic wind generator to move the chimes, using a "random generator" to create the sensation of "intermittent wind."   (Docket Entry No. 24, Ex. B, col. 4, ll. 16-18).

During the prosecution of the '416 Patent, Petruzzi argued to the examiner that it was not invalidated by the Japanese Patent, which claimed a chime that operated at regular intervals to mark time.  Petruzzi stated:

> Japanese patent JP 11084037 published March 26, 1999 showing an alarm clock that signals an alarm with a chime moved by generated wind and a regular half hour or hourly chiming function.  It fails to show or teach the use of an intermittent or random generator or programmable circuit for simulating the random nature of actual wind.

(Docket Entry No. 24, Ex. E, p. 3).  Petruzzi contrasted a chime moved by wind generated at predictable, regular, preset intervals from a chime moved by wind created by an "intermittent or random generator or programmable circuit."  Wind generated by an "intermittent or random generator or programmable circuit" is contrasted to the kind of regular, predetermined chiming noise necessary to function as an alarm clock.   Wind that is generated at regular, predetermined intervals can be used to operate chimes that serve as an alarm clock, but this is in contrast to "intermittent wind" that simulates the "random nature of  actual wind."   "Random wind" can be created by either an "intermittent or random generator or programmable circuit."  Petruzzi made it clear that "intermittent wind" meant wind that was not continuous nor regular.  The prosecution history does not, however, require the conclusion that "random" only means at intervals, whether regular or irregular, as opposed to occurring in a manner that is so irregular as to be lacking in pattern or predictability.

The specifications support a construction that "intermittent wind" means wind that blows at irregular intervals, while "random" appears to mean irregular or unpredictable occurrences that can be continuous or at intervals.  Several of the specifications show that "random wind" includes wind that may blow continuously, but at varying and unpredictable speeds and directions.  (*See* Docket Entry No. 24, Ex. B, Fig 4 and col. 3, ll. 26–44).   By contrast, "intermittent wind" means wind that blows at intervals, that are defined in the '416 Patent to mean only intervals that are irregular.  (*See Id.*, col. 2, 36–67, col. 3, 1–6, col.3, 26–45, col. 4, 1–17).[6]

This court concludes that "intermittent wind" in claim one of the '416 Patent means wind that blows at irregular intervals.

## III.      The Application for a Preliminary Injunction

---

[6]   Webster's Ninth New Collegiate Dictionary defines "random" as ". . . lacking a definite plan, purpose or pattern."  On Dictionary.com, "random" is similarly defined as "[h]aving no specific pattern, purpose or objective."  McGraw Hill's Scientific and Technical Dictionary defines random paired with several other words, including:

> random forecast [METEOROLOGY] A forecast in which one of a set of meteorological contingencies is selected on the basis of chance; it is often used as a standard of comparison in determining the degree of skill of another forecast method.

> random mating [GENETICS] A mating system in which there is an equal opportunity for all male and female gametes to join in fertilization.

By attempting to find a reliable dictionary definition of "random," this court runs into two of the problems the Federal Circuit warned of in *Phillips*:  that the extrinsic evidence is less useful than intrinsic evidence because it is not created "for the purpose of explaining the patent's scope and meaning" and "there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question."  *Phillips*, 2005 WL 1620331 at *11.

The law of the Federal Circuit governs the grant or denial of a motion for a preliminary injunction in a patent case, under 35 U.S.C. § 283.  To obtain a preliminary injunction in a patent case under 35 U.S.C. § 283, a plaintiff must demonstrate:  1) that it has a reasonable likelihood of success on the merits; 2) that it will suffer irreparable harm absent an injunction; 3) that the balance of hardships tips in its favor; and 4) that the injunction is in the public interest.  *Regents of the University of California v. Actagro, LLC*, 102 Fed. Appx. 681, 684 (Fed. Cir. 2004); *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001); *Hybritech, Inc. v. Abbott Lab.*, 849 F.2d 1446 (Fed. Cir. 1988).  The court must consider each of the four factors before granting a preliminary injunction, but the court is not required to articulate findings on the "third and fourth factors when the court *denies* a preliminary injunction because a party fails to establish *either* of the two critical factors."  *Reebok International Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994).

To demonstrate a likelihood of success, the patentee must show a reasonable likelihood of success with respect to showing both validity of the patent and infringement by the defendant.  *National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004); *Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239 (Fed. Cir. 2003); *Reebok*, 32 F.3d at 1555; *Hybritech*, 849 F.2d at 1451.  "In other words, if [the alleged infringer] raises a 'substantial question' concerning validity, enforceability, or infringement (*i.e.*, asserts a defense that [the patentee cannot show 'lacks substantial merit')

the preliminary injunction should not issue." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)(quoting *New England Braiding Co. v. A. W. Chesterton Co.*, 970 F.2d 878, 882-83 (Fed. Cir. 1992)).   If the plaintiff fails to demonstrate a reasonable likelihood of success on the merits, the court may deny the injunction without making findings on the three remaining factors.  *Holmes Products v. Catalina Lighting, Inc.*, 67 F. Supp.2d 10, 14 (D. Mass. 1999).  *See Reebok*, 32 F.3d at 1556(citing *New England Braiding*, 970 F.2d at 882).  If the accused infringer raises a "substantial question" of validity the plaintiff must demonstrate the question of validity "lacks substantial merit."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001); *Genentech*, 108 F.3d at 1364.

    "The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." *Reebok International Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (citing *Hybritech*, 849 F.2d at 1457).  The plaintiff must show that continued infringement would somehow cause damage that would not be fully compensable in money.  *See Hybritech*, 849 F.2d at 1457.  Furthermore, "there is no *presumption* that money damages will be inadequate in connection with a motion for an injunction . . . ." *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991)(emphasis in original).

    A trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and

properly finds that presumption rebutted by the nonmovant.  *Reebok,* 32 F.3d at 1557.

Among the types of evidence recognized as sufficient for this purpose is evidence that the

alleged infringer has or soon will have ceased the allegedly infringing activities, making an

injunction unnecessary, as well as evidence that the patent holder is not producing under the

patent.  *Id*. at 1558.

      Excellent Inventions does not make any product related to the two patents at issue.

These are "paper patents."   Excellent Inventions has made no showing that absent an

injunction, it will sustain any losses that are not fully compensable by money damages.  In

*Reebok*,  neither the patentee nor the alleged infringer were making the product at the time

of  the  lawsuit.   The  court  ruled  that  the  defendant  had  produced  enough  evidence  to

overcome the presumption of irreparable harm, despite the patentee actually having produced

the product and claiming harm to reputation.  *Id*., 32 F.3d at 1557–58.  Excellent Inventions

cannot even make the claim that its reputation is harmed because it never made any products

under the patent and has made no showing that it intends to do so.   The fact that some of the

allegedly infringing products remain in unsold inventory of Homedics's retail customers does

not present a sufficient basis for a preliminary injunction.  In *Reebok*, although the infringer

had ceased making the allegedly infringing shoes, there were still 33,000 shoes left to be sold

in retail stores throughout the country.  *Id*. at 1559.  The court found that this remaining

inventory would not  cause any measurable damage to the movant's reputation and that any

harm resulting from the sales was fully compensable in money damages.   *Id*. at 1559.

Homedics has made an even stronger case rebutting the presumption that Excellent Inventions is irreparably harmed.

Because this court has found that the presumption of irreparable harm has been rebutted, there is no need to make findings as to the third and fourth factors ordinarily part of the preliminary injunction analysis. *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996). This court would note, however, that the denial of a preliminary injunction will not adversely affect Excellent Inventions. On the other hand, Homedics would suffer immediate hardship if a preliminary injunction issued, in the form of impaired relations with its customers. There is no showing of a public interest that would be injured by the denial of a preliminary injunction. Because the court denies the preliminary injunction, it is not necessary to reach the issue of bond.

## IV.   Conclusions of Law

This court construes the disputed terms of the '763 Patent and the '416 Patent as follows:

'763 Patent, Claim One:     "Intermittent power" means power generated at intervals that can be either irregular or regular.

'416 Patent, Claim One:  "Intermittent wind" means wind that occurs at irregular and varying intervals.

This court denies Excellent Invention's application for preliminary injunction.

SIGNED on July 15, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge